You may proceed. Good morning, Your Honor. Thank you. May it please the court. I'm Mark Zuhl. I'm proud to be before the court representing Officer Carl Storm of the Bourbon, Missouri Police Department. The essence of this appeal is an interlocutory appeal from the denial of qualified immunity asserted on summary judgment before the district court below. There are two essential reasons why the denial of qualified immunity was faulty. First, the totality of the facts here created a circumstance where not only was it reasonable to use deadly force, but also Officer Storm would have been a fool to have done anything else, even with the benefit of 20-20 hindsight. And the second reason is the lone fact that the district court below found as allegedly being in dispute was actually never in dispute, nor was it even material to the essence of the assertion of qualified immunity. An empty-handed suspect can still be dangerous. This court has so held in at least four different cases. The district courts of this circuit have held many, many times in parks against Pomeroy, for instance, before this court in 2004, as well as in Nelson against County of Wright. It's been established that a suspect who is disobeying an officer's commands, who is showing a willingness to physically attack the officer because the officer is armed, that itself creates a dangerous situation. And that makes sense. Our officers are armed, holstered or not. The gun is a dangerous weapon. A person who is willing to engage in hand-to-hand combat with an officer, or who continues to approach an officer with a drawn gun, despite commands to stop, obviously has one goal in mind, overcome the officer. That person cannot possibly accomplish that goal unless their plan is to somehow disarm the officer. In this case, Mr. Wenzel had just been driving down a highway, a country highway, in a high-speed pursuit at times speeds up to 95 miles an hour. And I hope the court has seen now the dashboard camera of that high-speed pursuit. Routinely, as this goes on at these high speeds, this man being pursued as he crests hills, goes into the oncoming lane of traffic. Fortunately, he didn't kill anybody doing that. He routinely, as he rounds bends, drifts into the oncoming lane of traffic. As an officer seeing this in the midst of pursuit, you can only come to one conclusion. This fella doesn't care whether he, or anybody else around him, lives or dies. I watched the movie several times, and frankly, I got dizzy just watching it. And then, I'm glad I had the spoiler alert. I was glad that nobody got killed, because when I saw that pickup come over, I said, supposing, well, anyway. Yes, your honor, I had the same reaction. The second question is, well, I won't ask it now, but one wonders why it was necessary to chase this man when he could have been apprehended some other way, but I guess that's not the issue before us. That is correct, your honor, and I think that's a legitimate question to ask in the abstract. Whether Mr. Storm was ever disciplined for violating police procedures, I don't know, but that's not the issue. That is correct. I couldn't resist mentioning it. That is correct, your honor, and I think the states and the departments are certainly free to impose requirements on officers with respect to high-speed pursuit in terms of when let it go. Another thing about this, it reminded me of that, you probably are too young to remember, Steve McQueen's driving in the movie Bullet. Oh, yes, your honor, I'm old enough. I'm sorry, I'll quit interrupting you. Not at all. This kind of driving, though, it was beyond simply a violent felony, as this court held in the Hudson case in 2009. When you see somebody driving in this particular way, it's not just a vehicular pursuit, committing a violent felony. This was a man who was demonstrating a homicidal, suicidal tendency. That's not all. Our officer had been warned by this man's brother, not a week or two ago, that this guy was dangerous. He had been warned by this man's nephew, not 20 minutes earlier, that my uncle ain't going back to jail. Be careful. Be careful dealing with him. Now we can question, as your honor points out, the wisdom of pursuing or continuing to pursue a man like this at all. But that's his job. He's a police officer. And as we saw in Florida not too long ago, police officers can be disciplined for failing to take action as well as taking action when it's risky. And that's the nature of a police officer's job. Hockensmith against Brown, the Missouri court case says officers are to react with dispatching daring in response to dangerous situations. And Mr. Wenzel indeed presented a dangerous situation. There's no reason for a person to continue approaching an officer who has their gun out pointed at them, telling them to stop. There's no reason for that person to continue approaching the officer other than to get themselves killed or to kill the officer. Had Mr. Storm not decided to use deadly force at that moment, his options were extremely limited. If he had any at all, one, he could have sat there and waited to see what happened and hoped that the man would not succeed in taking his gun away from him to, as, as has been suggested in the survivor's brief, he could have tried to reholster his gun and could have tried to take out a less deadly option. The problem was among other things, we don't know how much time he had as viewed from the video. He's only a stride or two away, but there's a complication here. Our officer knew this man was suspected of using and selling methamphetamines and indeed his system was chock full of methamphetamines. Mace and, and an ASP officers are trained are rarely effective on such subjects. So knowing that this man was so, so suspected made that choice, if it was even available to him, uh, a very foolish one indeed to have even tried the fact that issue moving to the second reason why this case should be reversed. The fact that issued the district court found and the fact that the survivors have emphasized here is that Mr. Wenzel was not armed. And they say that by looking at the video, you can clearly see that he was not armed. And indeed you slow down the video and you watch it enough times. You only get 3.1 seconds by my timing of, of time that you can see Mr. Wenzel out of the car. Indeed, he probably is not armed. I've seen people hide weapons in their hands in bizarre ways. It's possible he was, but he was not in fact armed. And indeed from the video, it looks like he probably wasn't. That's me seeing it over and over in slow-mo several times. This court in Dooley versus Tharp said, that's not the way we, we view these matters in Dooley versus Tharp. The court reaffirmed the principle that an officer in a situation that tense created by the suspect's own doing must rely only on their perceptions they have in that instant. And it's not fair and it's not legal to second guess the perceptions. Well, the, our officer's perception was not even necessarily to claim I saw a weapon. No, he doesn't go that far. He simply says, as honestly as can be, I could not determine whether there was a weapon in those swinging hands. A perfectly reasonable thing for anybody to say, especially because this officer made it When I first got to the spot, I had been led away at 90 miles an hour from my jurisdiction down a country road. I had no idea where I was. I was looking for something to tell me where I was while I was trying to radio back to dispatch. Suddenly I look up and this man is already out of his car coming at me. I say, stop, show me your hands. Stop, show me your hands. He's a stride away from me. I fire. I don't know what else a person would have done. I don't know what else anybody could have done. It is a sad situation because Mr. Wenzel was not in fact armed and perhaps he wanted to kill himself or perhaps he was trying to kill the officer. We'll never know, but he created that situation and it is wholly unfair for a police officer to be expected to bet with their life on less than three seconds of observation of a swinging arm, whether they might be at the end of a gun or whether this person might not be strong enough and desperate enough and drug crazed enough to wrestle his own gun, which is already out of its holster away from him. And then he doesn't come home that night on a final note for the court before I conclude, or as I conclude it, this case was filed in January of 16 in September of 17 in the brief filed here for the first time, it was suggested that this might not be one of these cases where there's specific case law that governs as, as in most qualified immunity. It was suggested for the first time that this might be one of those cases where, uh, a move, a summary, uh, a plaintiff is excused from providing specific case law similar to this case because it's an obvious situation like hope against Pelzer, the United States Supreme Court case where the, uh, Alabama chain gang, uh, was, was tortured on hitching posts. It was suggested for the first time, then 17 months after this case had been filed almost four and a half years after the event at issue, I would suggest that if it took counsel four years to think of this, to note that it is wholly unfair to expect a police officer in three seconds to think of that. If this was such an obvious case, one would think that would have been asserted a little bit earlier, obviousness being obvious that we would think the judge knows a terrific judge, by the way, and for whom I have the highest respect, you would think the judge would have mentioned obviousness in the memorandum opinion below. It was not this case is far from one of the obvious situations that this court has found where the plaintiff is excused from finding specific case law demonstrating with particularity that all, but unknowingly, uh, law-breaking or a plainly incompetent law officer would have acted otherwise. And for those reasons, and all the reasons stated in the brief and in the 28 J letter, which by the way, I filed this morning in response to the 28 J letter last night, we request this court. Um, what do you have to say about the motion to dismiss this appeal for lack of jurisdiction? Yeah, your honor Hoyland is, is the case that I would refer the court to, which I believe your honor authored, uh, in Hoyland, this court reaffirmed from the principal and Smithson against Aldridge, that there's a difference between a dispute over historical facts, which is what their, their motion relies on and what their 28 J letter from last night relied on. And a dispute over the, what this court called the quintessentially legal determination as to whether these totality of the facts amount to a situation that would justify a reasonable law enforcement officer in perceiving a deadly threat. That is a legal question. And that's, you know, the district court did not take the facts here, uh, in the light most favorable to the, um, to the plaintiff. He, he just said there's a dispute. So there's a dispute, dispute of fact. So, um, that's, that's the basis and the fact of this, uh, for the decision. I understand. And the fact pointed to was, was simply the suggestion that Mr. Wenzel wasn't armed and it could be seen that he wasn't armed. As I argued below several times in writing and verbally on the transcript, which you can see from the appendix at pages 70 through 80, uh, it didn't matter whether from our standpoint, the threat existed regardless of whether the officer could see he was armed or not. He's that, that fact that the court relied upon as saying, as being in dispute was first was not in dispute. The officer never said he could or could not see a gun. Second, it didn't matter. The threat was the same either way, whether he knew he was armed or not. If you're going to frame, if the, if does judge knows, or the survivors want to frame the, the so-called fact and dispute as being whether the totality of these circumstances amount to one that justifies using deadly force. That is a legal question. As this court described in Hoyland, that is the question in every qualified immunity case. If that were a question of quote fact, end quote, sufficient to defeat an interlocutory appeal, there would never be an excess, a successful appeal from any denial of qualified immunity, because that is always the dispute. And for that reasons, and those contained in the briefs and in the 28 J letter, we request this court, uh, to reverse the decision below and enter instructions and instruct the lower court to enter judgment for, uh, officer storm. Very well. You'll save the rest of your time for revote. Counsel for the appellee. Good morning, sir. You may proceed. Good morning. May it please the court, James shuttle jr. Counsel for the Wentzel family. Um, first I'd like to address the, um, issue of jurisdiction and just respond to Mr. Zool's argument about the question of fact, and the question of fact was not the totality of the circumstances as pointed out by judge in his memorandum. The question of fact was the visibility of, of Mr. Wentzel's hands. And there was a, there was a dispute of whether or not his hands were visible. And in judge noses, uh, very well written memorandum, the judge pointed out that these are very fact sensitive cases and that visibility of the, of the, of the individual's hands is one is an important factor in considering whether the force was reasonable or not. And judge knows had cited a number of cases from this circuit and from other circuits that, uh, had addressed that important, uh, part of the analysis of the objective reasonableness standard. And, uh, as I pointed out in my 28 J letter filed yesterday, and I apologize, typically before oral argument, I do, uh, some case research cause there's a time lapse from the time these cases are briefed. Uh, just in December, um, this court issued the opinion of Franklin verse Peterson, uh, eight 78 federal third six 31. And, uh, similarly to this case, um, in Franklin, uh, this court, uh, dismissed a similar appeal, also a deadly force, uh, in a fatal shooting of Franklin. Um, the, the, uh, the ruling of the district court in this court's ruling was that the district court determined that the summary judgment record raised a genuine issue of fact concerning whether the officers faced a threat of bodily injury sufficient to the support, the use of deadly force. Thus, the court's determination was not a final decision. You know, there that's obviously that's the holding in Franklin. There's a whole line of cases that, uh, that, uh, also go down that path, but there's also a line of cases, uh, in our precedent that talk about, um, uh, mistaken, but reasonable conclusions. And if you start looking at the officer under these circumstances, you know, we've got the high speed chase. Well, I don't want to go through all the facts, but, but you end up with, uh, there's about three seconds, uh, is, is, is the amount of time that the officer has to observe. Um, your, uh, plaintiff's decedent is, uh, charging, uh, coming at a relatively high, uh, rate of speed, fairly agitated, closing quickly, uh, according to the dash cam video. And this officer has got to make a split second decision. And those are really kind of the cases. If you look around that the court has found where the doctrine of, of, uh, uh, mistaken, but reasonable has been applied as a matter of law. Um, why is this not one of those cases? I would think this is not one of those cases based upon, um, well, based upon the judge's ruling that did he, his analysis that he went through and, and, and analyzing the, um, the actual constitutional violation that, uh, your honor is addressing the, there, these totality of the circumstances, the seriousness of the crime is the crime that the suspect was alleged to have committed. The, the crime was improper vehicle tags. That's what led to the stop. That was the underlying crime. Now we could go into the chase and everything. Of course, my opinion is that that chase should have been stopped, um, relatively quickly once he sped because the, it's not like he was being chased for a murder or a robbery, uh, with the threat of, you know, deadly force used. Um, he wasn't, uh, saw with a weapon. Um, so under those circumstances, I think the initial chase was improper. But when you look at the, um, at the actual force that was used, the officer storm testified that he was familiar with the use of force continuum. Um, that of course is verbal commands. Then you use hand strikes. Then the next step is a baton, uh, mace. And then the final step would be the use of deadly force. So he went from verbal, verbal commands to deadly force. He had a baton on him. He had mace. He chose not to use either. Um, he used deadly force and ended Mr. Wentzell's life. Um, you know, it is, that's one of the factors that's important to consider, uh, under the totality of the circumstances. But the totality of the circumstances, do we have to take into the count, uh, officer storms, the knowledge of this man's methamphetamine use? Now he didn't, there was no evidence that he knew anything about that. There's no evidence. They produced a toxicology report, but officer storm obviously doesn't have a toxicology report at the time. In other words, you had no idea if this man was under the influence of methamphetamine at the he was under the influence of methamphetamine that was produced by a toxicology report that was obtained well after the incident. So did he know anything about Mr. Wentzell's lifestyle? In other words, I wrote down, is this a situation in which the shooting's victim lifestyle in effect sealed his fate is in his encounter with the police. Did, did officer storm know anything about Wentzell's propensity for violence? There was no, there was, there was testimony that he was a J3, which mean he was, um, he had confronted police officers before. Is there, as I at least read the briefs, there's an assertion that there was a history of assaulting officers in the past. And we have a statement that says he won't go quietly back to taking out a context or are they really part of the record? Um, I think, I think I made objections and I can't remember cause I think they're based on hearsay. Uh, and then the judge had rolled their not offer for the truth of the matter exerted, I think. Okay. But, uh, a lot of that was hearsay and it was self-serving, um, testimony, uh, produced by affidavit after his deposition was I don't believe that he testified to any knowledge of any kind of substance abuse or any, uh, history of substance abuse by Mr. Wentzell. Um, and what about the, the, the history of assaulting officers was, uh, was officer storm, uh, aware of that? There was a general code. They call it a J3 code, I believe. Uh, but that's just the general code that he would confront officers. I don't know that there's a, and I didn't see any evidence that he actually assaulted any officer. Uh, I reviewed police reports. A lot of that was produced in the discovery. Well, from what I, when I looked at the record, I didn't see specific evidence of that. Now it may be there, but that's why I was asking cause it certainly is, is argued in, in, um, or stated in the, in the brief. Right. And I can't say for certain judge without reading the record. Does the record show that officer storm knew the decedent? No, he did not know the decedent. I asked him, I asked him on the definition. He wasn't familiar with the decedent's physical size or anything? He had no encounters with Mr. Wentzell prior to this incident. And, and also, you know, Mr. Zuhl had speculated, uh, about Mr. Wentzell trying to take the gun and everything. That's all speculation. Mr. Wentzell could have been walking toward him just to argue with him. He could have stopped at the front of the vehicle. What we don't, we don't know is what, what would have occurred after had he not shot him. Um, and that's, that goes back to my argument on the use of force continuum, that if he continued to come, there was other options instead of killing Mr. Wentzell. Um, also is the, I wanted to realistic options, realistic options. I think officers are trained to handle situations like this. They're given a baton to use it. And if he is unarmed, I'm trying to remember what I, how I visualized the decedent leaving that car and coming towards the police car with his arms swinging by his side. Well, he has no weapon though. And he, if, if the officer has a weapon, that is what they're trained for, to use a baton when a suspect does not have any weapon, to strike him with a baton to disable him. He does not have to go from A to Z and pull out his weapon and shoot him three times and put one bullet in the side of his head, um, to blow his brains out. That's what he did. As far, as far as, uh, the decedent's reaction to the order to stop, what do we know? All we have is, all we have is Mr., uh, Officer Storm's testimony. That, that's all we have. The video, um, somehow the, it was recording audio, but somehow it did not record the audio at the time of the incident. Are you suggesting we should draw some negative inference from that? That it may have been doctored? I did. Because if you look at the beginning of the video, I believe you even hear sirens and you can actually hear, um, the stop of the, uh, it was actually his brother, I think, that he, he had stopped until he chased Mr. Wentzel. And so there is audio that was present up until the, up to the chase, and then it went, it just stopped, disappeared. And Mr. Zuhl said that, uh, it just wasn't recorded in the, uh, in the duplication of the, of the DVD. You know, the, the district court said that, um, a determination of what Storm perceived and considered requires a credibility determination that cannot be made at the summary judgment stage. Well, there's no way that can be an accurate statement. Well, I think what he's our only witness, right? Well, I think we have the video that's, that it's all we have with respect to this incident. So what's the credibility, what, what kind of credibility determination would I believe? I believe that Judge Nose was referring to the testimony of Officer Storm in, in contrast to what the video presents, that there was some testimony of Officer Storm when comparing to the video may not be accurate testimony as the video reflects. I believe that's the conflict that Judge Nose was referring to that, that his testimony could not be believed with the evidence of the video. Like, can you give me an example? With, with respect to the visibility of the hands and whether or not he was holding a weapon. Mr. Jewell argues that, uh, or that, uh, Officer Storm's testimony was simply that he wasn't sure. And I, I think I asked him directly, did, did, did he have a gun? He said no. Um, and I asked about the position of the hands. I think there was some testimony. I can't remember the exact questions, but there was a few line of questions that may have been contradictory to what the and I think that's what was pointed out in the briefing. And I think that's where Judge Nose had, uh, drew that conclusion that there's some testimony that conflicts with the video. Well, I guess what I'm getting at is, um, even if the, even if the officer said I couldn't see his hands, we've, we've all watched the video and we've, we can see the hands. So why can't we just exclude that statement and, and go with, with what's shown on the video? Well, because that's, that comes down to credibility. If he's saying something that's contradictory to the video. So, so what if he is? That's, that's not true. That goes to someone's credibility. But might that not just be a mistaken, but reasonable observation, right? Well, it could be, but that's, then you're into, if you're examine mistakes or whether it's, yeah, but we have a line of cases just like this one where we've said, Hey, you know, it might not be true. It might be a mistaken belief, but under these circumstances, it's reasonable. But we're talking qualified immunity lies in those cases, right? No, we're talking about testimony. I think the officer's testimony of what he said, I got reversed on one of these cases on, you know, mistaken, but reasonable. And, uh, well, I not to pick on you guys, but I don't believe his testimony that there was, it was a mistake. That's, that's not what his testimony was. But isn't the overarching or one of the overarching elements here is the fact that the decedent, for whatever reason, whether he was on mass or not, oh, when this high speed thing dangerously, thank goodness he didn't hit that pickup. And that was the only vehicle that they met through curves. They were both experts on how they kept their cars in the road on that snowy road. I don't know, but ultimately it wasn't, didn't he exhibit throughout that. What is a 14, 15 minute chase, a totally defiant attitude. Did the officer have his siren on and lights? Do we know? I believe so. I can't remember from what, in other words, is there any plausible suggestion that the victim did not know that he should have stopped? Um, no, there's not. And then coupled with the manner in which he left the car. And the only reason he left it is it got slid in the ditch and couldn't get away. Is it really plausible to think other than he was approaching the officer in a defiant, aggressive manner? Well, there was argument by me and I believe there was testimony of the record that obviously this is a small town and there, um, you know, I, I believe and that we would, we would produce additional evidence. This was at the summary judgment stage that, uh, that the Wenzel family, including Mr. Wenzel was, uh, harassed or picked out, um, and, uh, abused by officers. That's what the, that's what the testimony will show. Which would account for the victim's defiant attitude, I guess, or whatever you want to call it. Correct. The prior encounters with the officers and, uh, chasing someone over or trying to pull someone over tags, uh, that he was just stopped recently. I believe on that he was trying to get his tag straight. Um, so that's, that's what that goes to. And I see I'm out of town. Very well. We would ask that we affirm the district court's decision and very well. Thank you. From page 42 of officer storms, uh, appendix, the affidavit of, of Carl storm as of the date of the incident, I was aware that there was an active investigation by the bourbon police department into Gary Wenzel's methamphetamine use and distribution page 42 of the record, paragraph three, paragraph four. I'm sorry. Then on the very next paragraph, as of the date in question, I was aware that Gary Wenzel had previously assaulted another officer and had previous physical altercations with other officers, period, paragraph five of the record. As far as the audio goes, uh, Mr. Uh, uh, officer storm explained in his deposition at page 51, that's a quattro page. It's on page 39 of the appendix that he did not have time due to the high-speed pursuit and due to his concentration on the road and trying to keep his car on the road after this man, he didn't have time to activate the audio portion, which is why you cannot hear the siren and why you can't hear anything throughout the pursuit. And that was testified to, uh, yes, these things were said, were not said during his deposition because I did not take my own client's deposition. Mr. shuttle did, and very carefully, and I don't blame him refrain from asking him. So naturally these facts had to be demonstrated by affidavit. After the fact, your honor is absolutely correct about the line of cases with a mistaken, but reasonable impression. And in those line of cases, which duly against TARP is just the most, one of the most recent ones, three seconds is one of the very shortest times. It's not the shortest time that I could find of any time where a court said there wasn't enough time for an officer in that sort of a harrowing situation to be able to make a clear perception of what he had and had not. And I'll go a step further from our position he could just as easily have seen perfectly clearly that the man did not have a weapon in his hand. He still did not know what other weapons the man had on him. The Minnesota cases of Kane and Kalita, uh, Minnesota district court cases, to be sure both make it clear that an officer, especially in our world where many people are armed with concealed weapons, it does not need to assume that a suspect, especially when threatening them, especially when disobeying commands, especially when continuing to approach them is necessarily unarmed simply because they can see that the person's hands are empty. I could concede we don't necessarily, because the fact of the matter is he could see the man's arms, but in three seconds of swinging movement, he couldn't tell what was in the hands at the end of those arms. But we could concede for the sake of argument that even if he couldn't see those hands, and even if he couldn't see they were empty, this man nevertheless posed a threat such that a reasonable officer would have been playing with his life to have done anything else other than to shoot. He there, the court has seen the notion of putting away the gun and trying to reholster it in time and taking on another weapon, hoping it works against this meth crazed person is, is absolutely ludicrous. The suggestion is that officer storm should have bet his life that that would have succeeded. I submit that while the state may impose that bet or department might impose that bet, the constitution does not impose that bet on an officer. And that's why we request their court to reverse all the cases submitted. We thank both sides for their arguments. We will take the case under consideration.